Our third case for argument this morning is Cincinnati Insurance against the Estate of Chee. Mr. Reed. Good morning, your honor. Good morning. May it please the court. My name is Brian Reed. I am representing Cincinnati Insurance Company, the plaintiff appellant in this matter. This case arose as a result of Cincinnati Insurance Company's declaratory judgment action seeking a determination of its coverage obligations with respect to its personal umbrella policy issued to Sam Chee and Toni Chee and with respect to an underlying single vehicle auto accident. With respect to the exhaustion of the primary policy limits, are we talking about the duty to defend or the duty to identify? Because given the fact that Mrs. Chee was a mother of six children, four of them quite young, it seems fairly obvious that the potential liability for her death would quite likely succeed the state farm policy of, you know, the policy limit was $250,000. So I'm not sure why Cincinnati's duty to defend is not triggered. And your honor, that goes to the first part of the argument, which is that Cincinnati issued an umbrella policy and the obligations under the umbrella policy pursuant to the insuring agreement and most importantly the definition of ultimate net loss. Cincinnati's obligations kick in only when there is an ultimate net loss in excess of the underlying insurance which has been paid or payable by a settlement or a judgment. It's clear there's no judgment here. There's also no settlement here. At best what we have and what the other side of the defendants refer to is a offer made by a state farm to settle for policy limits which was neither, which is not accepted and it was a provisional acceptance as the district court found. So in fact there is no settlement. There's no settlement document. There's no release of the insured and certainly there's no judgment. So we're still at the stage where state farm as the primary insurer has the duty to defend obligations. Yeah, but we have a serious problem. State farm has tendered its policy limits. It has absolutely nothing at stake in the underlying litigation, has no reason to put up another nickel to defend and your client wrote a policy that gives Cincinnati a duty to defend and not just an option to defend. A duty to defend if the underlying policy is exhausted and more importantly if the claim is covered and that's actually the third issue. It's not if the claim is covered. It's if it could be covered. That's the doctrine. Correct. And our position is that the injury to an insured exclusion bars coverage for. That's a completely unacceptable argument because there's an exception to the exception for contribution claims and a contribution claim has been made. Right, but that kicks off the duty to defend. There is a pending contribution claim. Your policy expressly says that there's a duty to defend and maybe a duty to indemnify for such a claim. Well, you know, you might think you're going to win or that the defendant will win on the contribution claim but that doesn't affect the duty to defend. But it does affect your duty to defend, your honor, because there are two separate underlying suits. There is the suit brought by the estate of Tony Chee and the estate of Tony Tee alone against Sam Chee. Two parties, that's it. That is a strict negligence cause of action. There is no contribution claim asserted by nor could there be asserted by any party to that case. The only potential liability Sam Chee has in that case is arises directly from the claims made by Tony Chee or the estate of Tony Chee which are for bodily injury to an insured. There is a separate action that was commenced on the same day, however, the contribution claims didn't arise till nearly a year later and that case is the underlying medical malpractice case also brought by the estate of Tony Chee but brought against the treaters, the couple doctors and the medical facilities. That case relates to medical malpractice liability. Sam Chee wasn't a party to that case, had no potential liability relating to that case until May of 2013 when, in that case, the treating physicians and their employers filed counterclaims for contribution against Sam Chee. But they both arise out of Tony's injury and death and more to the point, it seems to me the doctors are seeking contribution from Sam based on his fault in the negligence lawsuit. And, you know, all of that is in your separate appendix one at pages 135 to 136. So I have the same, you know, concern that my brother, Frank Easterbrook does, Judge Easterbrook does. And your honor, Cincinnati has not denied that it might have a potential obligation to that counterclaim arising out of the medical malpractice case. That case is actually not, wasn't, and coverage regarding the counterclaim asserted in that case actually is in a party, a part of this suit, but it was conflated and brought into the suit and apparently confused the district court judge. Cincinnati reserved its rights. To the extent that Sam Chee has liability that arises from the counterclaim filed in the medical malpractice case, yes, the exception to that exclusion applies. Of course, we're not there yet because first the medical malpractice folks have to have liability so that there's no value to that claim yet. And then as an umbrella policy, we have no obligation to pay until there's some value to that claim. The issue is... You're confusing duty to defend with duty to pay. I don't see in this case any way to reach the duty to pay because there hasn't been any decision in the underlying litigation. And we keep saying that until there's a decision in the underlying litigation, the duty to indemnify is not ripe. So the only question we have before us, at least the only question we ought to be having before us, is the duty to defend. Correct, your honor, and State Farm is actively defending both cases. It has not exhausted its limits, it has not, and there's, as we cited in our brief, there's case law in Illinois that says a primary insurer cannot walk over and say, you know what, I'm going to pay my limits. I don't want to defend. Your honor's right that it was probably very evident at the outset that the potential liability here could exceed the limits of the State Farm policy. In fact, we raised that in our brief because that goes to the issues on the notice argument. Did State Farm have any incentive to really provide a diligent defense or do a diligent investigation? Perhaps not, but the fact of the matter is that State Farm has not paid, nor has anyone else paid, to settle Sam Chee's obligations in any and in any case. And Cincinnati's policy does not, no obligations under Cincinnati's policy. What does it mean to say that State Farm has tendered the policy limits? That sounds like State Farm has paid even if no one has cashed the check. It's basically, all we have is an affidavit from opposing counsel that says State Farm told us they would pay their limits if we released Sam Chee, but they have not done so. There's no argument that they have. Does the record make clear whether State Farm has written a check as opposed to written a check that hasn't been cashed, as opposed to not writing a check? Do we know in the record which of these it is? No one's alleged that they have, and there's certainly no evidence of a check in the record. I asked a concrete question about the state of the record, and I take it your answer is no. That's what I said, Your Honor, no. Well, who bears the consequence of uncertainty in that respect, of not having an answer in the record? The insureds. They have the burden of proof to prove their claim comes within coverage. Again, that's Illinois Supreme Court law. You are the plaintiff. Correct. In federal courts, plaintiffs have the burden of proof and the risk of non-persuasion. And if there is some important issue on which the record is silent, the usual rule is the plaintiff loses. That's the way federal litigation works. Sorry. And according to the case law that we cited, Your Honor, in the declaratory judgment, it's not necessarily the case. Cincinnati is... Actually, a federal court of appeals once said that, and they got reversed nine to nothing by the Supreme Court. That's about three years ago. We're not going to repeat that error. Very well. There's no record evidence that State Farm has made any payment and exhausted its policy. Cincinnati has no obligations until and unless that occurs. The three issues that Cincinnati seeks reversal on are the exhaustion issue, which we've addressed, the notice issue, and the application of the insured exclusion. And again, Cincinnati seeks application of that exclusion only to the vehicular negligence case. It's the declaratory judgment. In that case, there is no claim for contribution asserted by any party. Sam Chee's only liability in that case is a direct claim by the estate of Tony Chee. Chee is an insured on the policy, and therefore, the exception to that exclusion has no application to that claim. As we've stated, to the extent there's liability in the mid-mail claim, as a result of the counterclaim stated in that claim against Sam Chee, yes, the exception to the exclusion would bar Cincinnati from asserting that. And that's in concert with the language of the policy and in concert with the Illinois statute, which is why it's in the policy. Maybe I'm not, maybe I'm really just not understanding something here, but the doctors who were sued in malpractice action have sought contribution against Dr. Chee based on his allegedly negligent action in driving cars. So, I mean, it's, it just, I mean, so haven't they not only acquired but asserted a right of contribution against Dr. Chee? And if so, why does the policy exclusion for bodily injury to an insured still apply? I'm just not getting it. And, Your Honor, we're not arguing that it does apply to that claim, to that, to the counterclaim. It does not. It applies solely with respect to the vehicular negligence cap. These are separate avenues of liability, separate lawsuits, in fact, seeking damages from Cincinnati's insured. One, strictly on behalf of the estate. The second, the mid-mail case, starts as a mid-mail case. Within that case, a contribution claim is asserted. That brings Sam Chee into that case, which is then the only reason why Cincinnati has anything to do with the case. And because it's a counterclaim relating, as Your Honor has correctly noted, a counterclaim that says, Sam Chee, you have caused the underlying bodily injury to Ms. Chee, Cincinnati cannot assert its exclusion to liability that might arise for Sam Chee as a result of that counterclaim in the medical malpractice action. And Cincinnati has not, has not stated that it would, and Cincinnati did not deny coverage for that claim. Cincinnati reserved rights and said, we'll proceed with that. We'll work with you, Sam Chee, we'll work with your defense counsel and with State Farm in the defense of that action. If, in fact, the estate proves a claim against the medical malpractice defendants, and those defendants then successfully prove their counterclaim, then that, those damages, whatever that might be, is not precluded by the exclusion. And if it exceeds 250, then Cincinnati's got the excess of 250. If I might, with respect to the, to the notice issue, Your Honor, which we haven't, we haven't touched on at all. It's undisputed, and it's, and it's, it's very clear in the record that this was an auto accident in August of 2010. The first time that Cincinnati learns anything about the auto accident is in December 2011, 16 months later. Not from Sam Chee, who obviously was in the car and aware of the accident and the occurrence, but from the estate itself, which said, I would like to make a recover, a recovery under the policy. I'm an insured on the policy. And Cincinnati responded to that to say, well, this is, this is liability policy. You can't make a first party claim. And secondarily, obviously you're an insured on the policy and there's a bodily injury to the insured exclusion. Cincinnati first hears about the claim or his potential exposure or, or damages from Sam Chee in October of 2012, after the cases are filed. But if we, if we go with, and we have in the brief, if we go with the fact that Cincinnati's first notice at all from any party of the occurrence here, the claim here, was in December of 2011, we're dealing with 16, 16 months of delay. And under the, under Illinois Supreme Court law, there's a number of factors that we look to under, as stated in both Country Mutual versus Lavorsi and West American versus Yorkville. We look to the policy specific notice provision. We look to the insured sophistication in commerce and insurance. We look to the insured's awareness of an event that may trigger insurance coverage. We look to the insured's diligence and ascertaining whether coverage available. And finally, the only, and the only factor that was addressed at all in the underlying decision, prejudice to the insurer. As we've detailed in the brief, I think it is Cincinnati's position that this, there is a rebuttable presumption here of prejudice to Cincinnati by virtue of the fact that 16 months had passed before Cincinnati was even advised that anything had happened. Cincinnati was robbed of any opportunity to do anything for the full 16 months. And as, as Your Honor has already mentioned, we know that State Farm, for example, may have had no real reason to do much on its own. So we can't rely upon, and the case law suggests that we're not, Cincinnati's position isn't watered down or neutralized by the fact that there was a primary insurer doing something. Because, because... Doesn't the fact that, doesn't the fact that you were the excess insurer rather than the primary insurer play into all this? It can, Your Honor. But I think as Your Honor already noted, the, the, within 10 days or a week of the accident, Ms. Chee unfortunately passed, which obviously I think is, is a pretty clear indication to Mr. Chee that the value of the case, and as Your Honor already indicated, the potential value of the case was pretty evident from the outset that Mr. Chee should have known that the potential, his potential exposure there was going to exceed the State Farm limits, and yet for 16 months we heard nothing. Is there any duty or procedure where the primary insurer also looks into excess when they see this land before them? I think there can be, and sometimes duties arise with respect to obligations to settle the claim within the primary layer, but, but in terms of actually notifying the, the excess, I don't know, Your Honor, that there's a, there's an actual duty that, that they need to do that. Well as excess, would you then, when you finally did get notice, turn to the primary and tell them to pay up or do something, or, I don't know what, what an excess is supposed to do with, it's a five million dollar, and I also don't know what the five hundred thousand dollar per accident, whether that chimes in at all, you know, because I've, obviously for just one person it's $250,000, but for the whole action itself it's capped at $500,000. Correct, Your Honor. It, there's nothing in the record actually that, that, that speaks to that wrote coverage letters, and in fact, again, this is something we've discussed. The, the initial notice that came to Cincinnati from Sam Chee was originally the, the claim by the estate. This is a vehicular negligence case against Sam Chee, and that was the only case filed in August of 2012 that involved Sam Chee. So that case came in, Cincinnati took a look at it and said, well, in its response, in a coverage letter, and then also in the complaint that we filed, which tracks the same thing. We said, okay, we've, we have some questions on this. We believe that, that you've breached the policy's notice condition. We weren't aware of anything happening. We also believe that this case, the case that you have presented to us, is solely with respect to bodily injury to an insured. They're, those are the only claims that are asserted against you in this case, and therefore coverage was denied and the declaratory judgment was filed. Again, eight months later, May of 2013, contribution claims were filed in that separate action. That was tendered. Cincinnati got notice of that. We, again, wrote a coverage letter to say, thank you for tendering it. We, we have questions. It looks like it potentially arises to the same occurrence, but we understand that your potential liability here arises from the counterclaim that's not been filed by the med malpractice defendants. That appears to us to, fall within the, the exception to the bodily injury exclusion, and therefore reserve rights, because we're not exactly sure what's going on here, again, because we don't have a lot of information. We'll reserve rights, but we'll work with you and let's figure out what's going on in this, in this medical malpractice case, and we'll work with you and work with your primary carrier in your defense. As time goes on, where are we? The, the two underlying cases are still pending, your honor. They were filed in 2012. They're still going, so there's been no determination of liability in either action. Not really privy to where they stand and why that is the case, but there has been no ruling. Cincinnati doesn't believe, for the reasons we've discussed, and the reasons in its complaint, that it owes no obligation to Sam Cheeve to the extent that, on the basis of either late notice or the bodily injury to the, to the insured exclusion, for liability that he might occur as a result of the, the estate's suit against him. If, and, and, and that's the, that's the, the ruling we see today is a reversal of the court's ruling stating that Cincinnati's exclusion does not apply. And, and in fact, the court and the district court found Cincinnati's argument to be moot and, and held that Cincinnati couldn't raise the argument because it was claim splitting. And I think if your honor looks at the case law, that's, that's clearly not the case. Claim splitting is, for example, if there was a prior action that went to, went to judgment on the merits that said, Cincinnati, you, you owe coverage on this case. Cincinnati couldn't then bring a subsequent case and say, no, no, we, we can't, we don't owe coverage for that case for these reasons that should have been brought in the other. That there's simply, it's inapplicable here. There's, there's, this is the only action brought. There's no judgment on the merits. And in fact, Cincinnati hasn't even denied the other claim, much less filed a declaratory judgment action on it. I see I'm into my time for, rebuttal. Any further questions at this time? Not at the moment. I think you have about 15 seconds left. Thank you, Your Honor. Mr. O'Day. May it please the court and honorable judges, I represent Dr. Sam Chee, who was in the automobile at the point where a squirrel ran in front of it. He swerved to avoid the squirrel and hit a tree. It's not a complex car accident where you have a number of vehicles on an interstate or anything like that. Was anyone else injured in the car? Yes. Her son from another relationship was injured and he's filed a claim that is probably not a $250,000 claim. What about the three-week-old baby? She, she was okay. The three smaller children were okay. Sam was okay. His wife suffered a broken ankle and some broken ribs that were diagnosed at the hospital. At the hospital, though, there was a CT scan that showed a break in the cervical vertebrae that went undiagnosed. They took the collar off that had been put on there by the EMTs on the strength of the reading of that CT scan. Then at autopsy, a week later, the autopsy doctor found the break. Then they went back and looked at the CT scan and saw that the break had been there all along. So it's our position in this case that we have, I think, loaded the record with facts about the malpractice by the physicians in the hospital and that we have shown that we're not in any way in a situation where Dr. Chi has tried to put anybody up to a malpractice case or tried to get the malpractice case going so that he would have coverage under a policy because... One of the state court suits is a suit by the estate against Chi. How is that even arguably covered by the policy? The policy, I think, talks about occurrences, not specific lawsuits, and where there's coverage for an occurrence, that applies whether there's different lawsuits or not. In this case, the exception about acquired right of contribution doesn't talk about anything about separate lawsuits or asserted claim of contribution or whatever, just talks about an acquired right of contribution. We've established that under Illinois law, at the moment where the medical malpractice occurred, the medical malpractice defendants acquired a right of contribution. The Illinois courts call that an inchoate right of contribution. And then, in addition to that, they've asserted it, but I think the point is they've had this right of contribution all along and the policy language says acquired, not asserted, and now the insurance company's trying to change the word acquired to even when that's not the language that they're used in their policy. And this happens throughout this case, where the insurance companies have a rule against them that's a little different than anybody else. It's that if there's an ambiguity in a policy, it gets interpreted against them. Here, I don't think there is an ambiguity. Could you clarify to what extent it is the duty to issue in this appeal versus the duty to indemnify? Our position, on behalf of Dr. Chee, is that he bought two layers of coverage here and duty of defense, and that both insurance companies, State Farm and Cincinnati, have a duty to protect him. They have a duty to protect him by making sure that there's a vigorous defense. They have a duty to protect him by considering settlements, and if they can settle the cases within the policy limits to protect him from personal exposure of his own assets, that's what they should be doing. And then, if there is a settlement or a judgment, that they should be paying that, and if the judgment's higher than $5 million, and State Farm and Cincinnati had a chance to settle for $250 and $5 million and they didn't take it, that that would be a breach of the standard of care and the fiduciary duty owed to the insured. So that's sort of the overall picture as far as Dr. Chee is concerned, and that we think that they shouldn't be allowed to change the insuring agreement that he and his making changes in language, such as saying acquired now means asserted, by saying, by reading out, for example, in the notice provision, the provision that says that we have no duty to provide coverage based on a failure to comply. If it's prejudicial to us, they want to read out the word prejudicial or say, well, that wasn't the only thing that we meant. We could have meant also something wasn't prejudicial, or if it was prejudicial, we've got all these other factors that have to be considered that aren't even in the policy. We've got them trying to interpret ultimate net loss, which uses the words paid and payable in the alternative, to now say, well, it has to be paid. And that's our overall position, is that they have a duty to protect him, not to nitpick policy language and try to create ambiguities where none exist, and then to try to resolve the ambiguities in their favor. We believe- With respect to the exhaustion of primary coverage, I take it State Farm won't actually pay anything until Sam Chee is released from liability. Is that a typical condition? And if so, how do insurers like Cincinnati typically react to such conditions in terms of when to become involved? Well, I think that what happens is the primary carrier, once they tend to their limits, then the typical umbrella carrier or excess carrier will come into the picture and first of all make a decision about whether they should be defending if the underlying primary carrier is not doing a good job or can't be expected to do a good job, and then also to evaluate whether in a settlement they should be offering money to protect their insured from a judgment in excess of the policy limits. And so I think that's what the common practice is. In this case, though, what happened instead was they filed a declaratory judgment action asking that they be completely absolved from any exposure or liability under their insurance policy, that the policy doesn't apply, that they have no duties until there's exhaustion. We think that we have exhausted the limits with State Farm with them making their tender. They're protecting their insured, Dr. Chee, by saying that they want a general release, which is common. It's also common that in the case of an umbrella policy, there's no general release that's going to be executed if there's a chance or probability that the verdict could go higher than the primary coverage, and we think Cincinnati should step up to the plate and provide what Dr. Chee and his wife purchased. With regard to notice, up until the lawsuits were filed in State Court, State Farm was treating this matter as an uninsured case, because Mrs. Chee was an insured under the policy. She had a claim against Dr. Chee, well, just a tort claim against Dr. Chee, and then State Farm's position was that because of the same household exclusion, that Dr. Chee didn't have liability coverage of $250,000, that rather he had uninsured coverage, or rather he didn't have any coverage at all, which would give them Mrs. Chee as the insured under the policy, or her representative, $250,000 contract claim against the insurance that she had purchased because he's uninsured. Then State Farm changed from viewing it as an uninsured case after State Farm, I think, thought that the medical malpractice case was brought in good faith, and so State Farm has provided them a defense under the liability coverage and made a tender of its limits under the liability coverage, not only in the malpractice case, but also in the car accident case, because they now recognize it's a liability situation, not an uninsured. State Farm's position was that they had the very same language about same household and acquiring, somebody acquiring as a third party a claim of contribution. They've interpreted that then to mean that there is liability coverage under their policy with that language, even though Cincinnati says, based on the same language and the same statute, that that is not true. That's why I think it was important that we loaded the record with the medical malpractice evidence to show that there really is a claim for contribution by those defendants. They missed a fracture at the cervical level that weakened her body anywhere below the cervical level. She laid in bed. Nobody could figure out why she was so lethargic, and then she ends up not moving much, and she ends up with a pulmonary embolism where everybody had hoped she just had a broken ankle and some broken ribs. So the malpractice claim, we feel, is legitimate. We feel that they do have, under the law, a cause of action for contribution against the original tortfeasor, and we believe that, unfortunately, Dr. Chi was in the same medical group as made the bad decision on the CT scan, although he worked at a different hospital than the one his wife was at, and, unfortunately, he has to say, too, though, that they committed malpractice by missing that fracture. So we think State Farm, that they have a duty of defense whether they want to spend another nickel or not, but that if Cincinnati's worried about it, they should step up to the plate and defend if they don't think State Farm's doing a good job. Now, before the district court, they never claimed that State Farm was doing a bad job. They never presented any proof. We put into the record that a letter from State Farm to its lawyer that it hired, not its lawyer, but Dr. Chi's lawyer, John Fleming, telling him to defend the case, and so if they're accusing State Farm now of doing a bad job, they're not just accusing State Farm of not presenting an adequate defense and that that's why they've somehow been prejudiced by this allegedly late notice that they're saying should have been given a week later, but to this day, to this day, they're saying their policy doesn't apply, and then that's in one breath, and then in the other breath, they're saying, well, Sam Chi should have known a week after the accident that the policy applies. The umbrella coverage references the $250,000 in underlying coverage. The umbrella policy says that if that coverage is not there, liability coverage, then nothing's owed. The umbrella policy says it doesn't have anything to do with it as uninsured case rather than a liability case under its coverage. There would have been no, if that had held true all along and not developed into a situation where State Farm said it's changed now from uninsured to liability, we probably wouldn't be able to say that, at least if there's an asserted claim, we probably would still be saying there was an acquired claim for contribution. The umbrella policy requires an underlying of $250,000, $500,000, right? Yes, and that was the State Farm policy, so if that policy had not had liability coverage because of that exclusion for the same household, then State Farm would have correctly been calling it an uninsured claim that then it became sort of different. He became insured, thus the liability of $250,000 was there, and that triggers then, in our view, the umbrella, especially whereas here, the underlying primary carrier has tendered the policy limits. Thank you. Thank you, Mr. O'Day. Mr. Doris. Honorable Justices, may it please the Court. I think it's important that I first identify who I actually represent. I represent the estate of a woman who is deceased. Toni Chee died as a result of the accident and subsequent medical treatment, but the estate is only a vehicle to bring litigation. It's not the real party of interest, but since a deceased person can't bring or defend lawsuits, you have to have an estate established. The real claimants in this case are little Connor Chee that was three weeks old, been born by cesarean birth, which caused her mother not to have a seat belt on at the time of the accident, Ella, two, Emily, five, and then the children from other relationships, Steve Vanderclay, 12, Gage Vanderclay, 15, and Nicholas Schlieger, 19, who was an adult. So what is our role in this declaratory judgment? It's my position that we were named a party, and I guess that may be a legal requirement, but we're really not able to even have standing for many of the issues that are before you. Just like these little children had no control over that vehicle when it went off the road and struck a tree, they had no control over the medical care. In the legal case, we are... the estate is named as a party because the estate is a plaintiff in the underlying state litigation. There is no alternative to naming it as a party. No, I understand that we need... That's the way litigation for decedents works. So what is your argument? My argument is that at the time of... we had no duty, because we're not a party to the insurance contract, we had no duty to notice anybody, we had no standing to be involved in the negotiation of the contract, the insurance contract. We're not... we're only... I think... What does any of this have to do with the issues before us now? To stress the fact that we have simply joined in the argument of Attorney O'Day, because the real damage in this case, the legal damage is, if the coverage is denied, Sam Chee will personally be exposed to not having defense and being obligated on the judgment. That's the truth of the reality, that the legal... the legal interaction is between Sam Chee, who is the policy holder. The damage legally will be to him. What I'd like to stress on behalf of the... talking about the real parties of the interest, the most important repercussion of your decision will be those children. Whether they have a right to recover because of the wisdom of their parents in purchasing this policy or not purchasing the policy, even though the legal standing and the defense of that, whether there's coverage or not, belongs to Sam Chee, the repercussions, the real practical repercussion will be to the children. They will be left with an inadequate recovery. Some of these issues, we did notify Cincinnati at the... at an early opportunity when we just moved forward with litigation, and both of those cases are now pending in circuit court in the state of Illinois and will be pursued. But on this issue about whether there's exhaustion, what's in my opinion missed in that is that State Farm has, quote, tendered the policy limits. But, there's a but there. They have required... Do you agree with Mr. Reed that the record does not show what that means? Yes, sir, I agree. Why does the record not show what it means? I can imagine a lot of meanings that they have cut a check and no one has signed it, that they've offered to do it and somebody has objected for some reason. I mean, this might actually be important and no one has put the information in the record. I think that the answer requires drawing some conclusions, not speculating, drawing some conclusions, because State Farm went beyond tendering the limits. I don't know what you mean went beyond tendering when we don't know in this record what State Farm did concretely. They communicated... If we don't know what they did concretely in the record, then we don't know what it means to go beyond doing what it is we don't know they did. Well, we know what they did. They tendered, by meaning they communicated their willingness to pay the limits. Well, then you must be saying that we do know in the record what they did and you just said... Well, we know one other thing they did. Look, the record either shows what they did or it doesn't. Mr. Reed said it doesn't. You then said it doesn't. It doesn't. And now you're telling us it does. They can't both be true. It doesn't answer the question whether they tendered the payment or a check and physically put it in our possession. What I believe is not involved in the conversation is they showed a willingness to pay the $250,000 and were binding themselves, but they required a release. A release would have released not only State Farm, SAMHSA, but Cincinnati from any obligation. Obviously, plaintiffs of the estate could not sign a release that would... Do we know... Is there a document to that effect in the record? Or are you just testifying? No, I'm not testifying. Well, then... That's already been referred to by the counsel. I believe it's in the record. Is there a document to that effect in the record? I believe so. The tender was... It's referred to extensively. Look, it might be important to the disposition of this case what the record shows about what  The court would like the parties within a week to inform us exactly what the record shows about what State Farm has done, about why no money has been dispersed, and whether it would help us to know whether the parties agree on that statement and where we can look in the record. Yes. Okay? But it's clear... Thank you very much. Thank you. Anything further in your remaining 15 seconds, Mr. Reed? It will be brief. And really, this is in response to counsel's statement regarding what the policy pays for The policy doesn't pay for occurrences. It pays for damages. And the damages need to arise from an occurrence. We don't dispute that. There's just two separate kinds of damages being sought here. And they're being sought in two separate cases. One that Cincinnati contends it doesn't owe coverage for. One that it might very well owe coverage for, depending upon how the medical malpractice case plays out. The only case that is before the court today, the only case on which we sought a declaratory judgment action, was the vehicular negligence case brought solely by the estate, solely relating to injury to Ms. Chee, who was an insured under the policy. And that's not disputed. That's all I have. Okay. Thank you very much. The case is taken under advisement. And we will look forward to receiving information about what State Farm has done.